UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**Delynn J. Speleos** and
**Jesse S. Speleos**

Plaintiffs

v.

**BAC Home Loans Servicing, LP** and
**Federal National Mortgage Association**

Defendants

Civ. A. No. 10-11503-NMG

**The Speleoses' Additional Statement of Undisputed Material Facts, and Responses to Defendants' Statement of Material Facts**

## The Speleoses' Additional Statement of Undisputed Material Facts

1. Defendant BAC Home Loans Servicing, LP ("BANA") has a contract with defendant Federal National Mortgage Association ("Fannie Mae") pursuant to which BANA services mortgages for Fannie Mae. Culik Decl. Ex. 1, Servicing Contract.

2. The contract requires BANA to act under the direction and control of Fannie Mae with regard to servicing of Fannie Mae's mortgages.

> Scope Of Duties. The Lender [BANA] will diligently perform all duties that are necessary or incident to the servicing of: all mortgages it is servicing for us [Fannie Mae] on the date this Contract takes effect; and all other mortgages that the Lender is required to service by the terms of this Contract or any other existing or future agreement between us and the Lender.

Culik Decl. Ex. 1, Servicing Contract § V.A.1; Culik Decl. Ex. 4, Ver. Compl. ¶ 16.

3. Fannie Mae's instructions to BANA for servicing mortgages are contained in, among other places, guidelines that Fannie Mae promulgates.

> Service According To Guides. Any mortgage serviced under this Contract, which we own or in which we have purchased a participation interest, must be serviced by the Lender according to the provisions in our Guides that are in effect on the date of this Contract or as amended in the future.

Culik Decl. Ex. 1, Servicing Contract § V.A.3.

4. The Servicing Contract also requires BANA to act in compliance with existing consumer-protection laws such as Mass. Gen. Laws ch. 93A.

> **Compliance With Consumer Protection Laws.** The Lender has complied with any applicable federal or state laws, regulations or other requirements on consumer credit, equal credit opportunity and truth-in-lending.

Culik Decl. Ex. 1, Servicing Contract § IV.A.15 (emphasis in original).

5. The Servicing Contract also obligates BANA to follow Fannie Mae's guidelines for the Home Affordable Modification Program ("HAMP"). *See generally* Culik Decl. Ex. 2, Fannie Mae Ann. 09-05R.

6. HAMP is a program to modify the mortgage loans of borrowers at risk of foreclosure by modifying their mortgages to affordable payments under a formula established by Fannie Mae. Culik Decl. Ex. 2, Fannie Mae Ann. 09-05R, p. 1 (stating HAMP is "[a] national modification program aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels"

and that under HAMP "[s]ervicers will use a uniform loan modification process to provide eligible borrowers with sustainable monthly payments.").

7. The modified mortgage payment must be an amount equal to 31% of the borrower's gross monthly income. Culik Decl. Ex. 2, Fannie Mae Ann. 09-05R, p. 10 ("Servicers must apply the proposed modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going below 31 percent (the 'target monthly mortgage payment ratio').").

8. The modification steps are called the "waterfall," and reduce the payment by reducing the interest rate as low as 2%, extending the term to a maximum of 40 years, and providing a principal forbearance, i.e., making it so that the borrower does not have to pay interest on a portion of the principal balance. Culik Decl. Ex. 1, Fannie Mae Ann. 09-05R, pp. 10–11.

9. This process is explained by BANA's corporate deponent Donna Diane Deloney:

> A. The waterfall is how we change – reform the loan in order to draft – or in order to obtain 31 percent of the gross income payment amount. So first what we'll do is capitalize all the delinquency. And if their payment is still not 31 percent of their gross income, then the next step will be to reduce the interest rate. And if we can't get it down to, again, a 31 percent payment doing that, then we'll extend the term, which means we could extend it out to 480 months. If that's unsuccessful, then there's also the principal forbearance plan as well.

Culik Decl. Ex. 6, Dep. of Deloney at 21:20–22:9.

10. There is no risk of so-called moral hazard by doing a HAMP loan modification, as no principal or interest are forgiven; rather, the borrower must repay all amounts owed. Culik Decl. Ex. 2, Fannie Mae Ann. 09-05R, p. 11 ("A principal write-down or principal forgiveness is prohibited on Fannie Mae mortgage loans.").

11. Foreclosure is prohibited for borrowers that are eligible for loan modifications:

> **Foreclosure actions** . . . including initiation of new foreclosure actions, **must be postponed** for all borrowers that meet the minimum HAMP eligibility criteria.

Culik Decl. Ex. 3, Fannie Mae FAQs for Ann. 09-05R, p. 2 (emphasis added).

12. Any foreclosure activity must be canceled after a homeowner has applied for a loan modification under HAMP:

> To ensure that a borrower currently in foreclosure or at risk of foreclosure has the opportunity to apply for a HAMP modification, **servicers should not proceed with a foreclosure sale until the borrower has been evaluated** for the program.

Culik Decl. Ex. 3, Fannie Mae FAQs for Ann. 09-05R, p. 3 (emphasis added).

13. The Speleoses have been attempting to modify their loan through HAMP since approximately March 2010. Culik Decl. Ex. 4, Ver. Compl. ¶ 14.

14. The Speleoses' complete loan-modification application was submitted by July 15, 2010. Culik Decl. Ex. 4, Ver. Compl. ¶ 22.

15. Mrs. Speleos is and has been gainfully employed full-time as a data-entry clerk. She earns $19 per hour and occasionally works overtime. Culik Decl. Ex. 5, Dep. of D. Speleos at 9:15–18.

16. Mr. Speleos, although previously unemployed, started his own painting company. In the first six months since starting the company, Mr. Speleos earned approximately $11,000. Culik Decl. Ex. 5, Dep. of D. Speleos at 11:1.

17. The Speleoses' gross monthly income as calculated under the HAMP guidelines at the time that they applied for a loan modification was $2,720. Culik Decl. Ex. 5, Dep. of D. Speleos at 30:10–15.

18. The total amount due on the Speleoses' mortgage was approximately $185,767.51. Culik Decl. Ex. 8, Defs' Resp. to Pls' Req. for Produc., BANA000028 (stating "TOTAL DEBT AMOUNT: $186,767.51").

19. The Speleoses' monthly escrow payment for taxes and insurance was $333.38. Culik Decl. Ex. 10, Defs' Responses to Pls' Request for Production of Documents, BANA00001 (stating "Escrow Payment: $333.38").

20. The Fannie Mae corporate deponent, Theresa Cowan, stated that the Speleoses mortgage "would qualify" using the above figures:

Q. I see. If the principal forbearance were allowed under the Fannie Mae guidelines, speaking hypothetically –
A. Right.
Q. – then it sounds to me like my clients' loan would have been eligible for modification. If – if –
MR. RAPHAEL: Objection.
Q. – all the numbers I'm saying are correct, do you – **do you think that if the principal forbearance were allowed that this loan would have been eligible for a loan modification?**
MR. RAPHAEL: Objection. [Speaking objection omitted.]
. . . .
A. If, you know, going through and using the numbers you used that are hypothetical, and if it met the criteria established for net present value after run through the model, and it met those, then **yes, it would qualify**. But without having the model and the actual numbers I can't speak to specifically to your clients' loan. [The "hypothetical" numbers were the numbers taken from Defendants' own document production and plaintiffs' documents, as stated above in ¶¶ 17–19.]

Culik Decl., Ex. 7, Deposition of Theresa Cowan, at 51:18–53:17.

21. Mrs. Speleos was also told by a representative at Making Home Affordable that the mortgage qualified for a loan modification under HAMP.

A. I spoke to Making Home Affordable.
. . . .
Q. And what did they say to you?
A. They also went over all my paperwork. I had to fill out a whole thing like this again for them and **they basically told me the same thing that I had been told when I initially called Bank of America about doing the HAMP loan, that I should qualify and they could couldn't understand why we were having such an issue. They actually called Bank of America with me**

> **on a conference call to ask them what was going on.** This was right before the sale.

Culik Decl. Ex. 5, Dep. of D. Speleos at 43:13–24 (emphasis added).

22. Mrs. Speleos was also sure that she qualified for the loan modification:

> Q. So my question is: Even if the bank had stopped the foreclosure sale, **do you think you would have qualified for a modification based only on your monthly income**?
> A. **I do**.
> Q. And what monthly mortgage payment would you have been able to afford based on your monthly income in consideration of all the other monthly household expenses you have listed here?
> A. As I said, I would have had to have gone back and trimmed some fat off. We would have had to go without certain luxuries like cable television. I would – and I possibly would have had to get a second job.

Culik Decl., Ex. 5, Dep. of D. Speleos. at 48:21–49:9 (emphasis added).

23. The Speleoses' loan would have been modified by taking their total amount due of $185,767.51, reducing their interest rate to 2%, extending the term to 40 years, and providing a principal forbearance of $17,412, which was approximately 9.4% of the principal balance. These steps result in a monthly mortgage payment of $843.20, approximately 31% of the Speleoses' gross monthly income of $2,720.

24. BANA promised Mrs. Speleos that it would rescind the foreclosure if for some reason the foreclosure occurred before the loan could be modified:

> Q. [D]id you reach out to the bank again?
> A. Yes.
> Q. And do you recall when that was?

> A. I do not.
> Q. Okay. And do you recall what the nature of that conversation was?
> A. I was told – I called every day from the time they told me I had to call a week ahead of time, I called every day between then and the actual day of the sale. I actually even called on the day of the sale. Each day I was told it hasn't been canceled yet. By the time it was the day of the sale, they said we can't cancel it now. I said, well, what am I going to do if they sell the property today and **they said if they sell the property today, they would rescind the sale because it's – I forget the exact wording, but it wasn't – it wouldn't be a proper sale. It wouldn't be allowable and that we would just continue on with the HAMP consideration at that point.**

Culik Decl. Ex. 5, Dep. of D. Speleos at 41:4–23 (emphasis added).

25. BANA and Fannie Mae foreclosed on the Speleoses' home on August 5, 2010. Culik Decl. Ex. 4, Ver. Compl. ¶ 35. As a result the Speleoses lost legal title to their home.

26. At the time of the foreclosure, the Speleoses were under review for a loan modification, and were told that a foreclosure would not be conducted. Culik Decl. Ex. 4, Ver. Compl. ¶ 27. Mrs. Speleos testified to the same at her deposition.

> A. I was informed that since I was under active consideration for HAMP, that they would not be selling the property and that they would rescind the auction and I was told to call back I believe it was a week before the actual sale date and just make sure that they had canceled the auction.

Culik Decl. Ex. 5, Dep. of D. Speloeos at 40:1–6.

27. Mrs. Speleos had repeatedly called and informed both BANA and its foreclosure attorneys to request that the foreclosure be canceled. Culik Decl. Ex. 5, Dep. of D. Speleos at 39:18–42:16; Culik Decl. Ex. 4, Ver. Compl. ¶¶ 27–34.

28. But the foreclosure was not canceled and has never been rescinded, and the Speleoses never received a loan modification.

29. Mrs. Speleos had even called BANA on a conference call with a representative from Making Home Affordable who told BANA prior to the foreclosure that the foreclosure should be canceled. BANA refused to cancel the foreclosure, and refused to allow Mrs. Speleos to speak with a manager about the issue. Culik Decl. Ex. 4, Ver. Compl. ¶¶ 28–31.

30. In additional to losing legal title to their real property, the Speleoses lost income as a result of the foreclosure, including, for Mrs. Speleos, at least a week at work, not including time that she had to punch out making phone calls to BANA related to attempting to obtain the loan modification Culik Decl. Ex. 5, Dep. of D. Speleos at 57:2–10, 62:12–20.

**The Speleoses' Responses to Defendants' Statement of Material Facts**

1. On October 30, 2007, Plaintiffs purchased a property located at 750 Whittenton Street, #1022, in Taunton, Massachusetts ("Property"). Docket No. 29, Amended Complaint ("Am. Compl.") ¶¶ 6, 10.

   **Plaintiffs' Response:** Not disputed.

2. To finance the purchase of the Property, Plaintiffs executed a note with Stonebridge Mortgage Company in the amount of $175,900 ("Note"). Declaration of Neil D. Raphael ("Raphael Decl."), Exhibit A, Note.

   **Plaintiffs' Response:** Not disputed.

3. To secure the Note, the Plaintiffs executed a mortgage on the Property in favor of Mortgage Electronic Registration Systems, Inc. Am. Compl. ¶ 10; Raphael Decl., Exhibit B, Mortgage.

   **Plaintiffs' Response:** Not disputed.

4. Mr. Speleos became unemployed in November 2009. Am. Compl. ¶ 12.

   **Plaintiffs' Response:** Not disputed.

5. Plaintiffs have been in default on their loan since November 2009. Affidavit of Mayrion Washington ("Washington Aff.") ¶ 3; Raphael Decl., Exhibit C, Deposition Transcript of Delynn Speleos ("D. Speleos Tr.") at 58:20-24.

   **Plaintiffs' Response:** Disputed in part. Although the Speleoses fell behind on their mortgage, they applied for a loan modification around June 2010. Culik Decl. Ex. 5, Dep. of D. Speleos at 28:16–19. As explained above, the Speleoses' financials qualified them for a loan modification that would have cured the default. *See* Plaintiffs' Statement of Undisputed Material Facts, ¶¶ 17–22 (quoting, among other things, statements by the Fannie Mae corporate

representative and a Making Home Affordable representative that the Speleoses qualified for a loan modification).

6. BANA commenced foreclosure proceedings and on August 5, 2010, BANA purchased the Property. Am. Compl. ¶¶ 35-36.

**Plaintiffs' Response:** Disputed in part. Both BANA and Fannie Mae commenced foreclosure proceedings, as BANA represents Fannie Mae with respect to the foreclosure. Culik Decl. Ex. 5, Ver. Compl. ¶ 16. Furthermore, Mrs. Speleos called BANA numerous times to request that the foreclosure sale be canceled, but BANA refused to cancel the foreclosure sale. Culik Decl. Ex. 4, Ver. Compl. ¶ 27.

7. BANA assigned its interest in the Property to Fannie Mae, the present owner. Am. Compl. ¶ 37.

**Plaintiffs' Response:** Disputed that Fannie Mae is the present owner. Although Fannie Mae has record title, equitable ownership is with the Speleoses.

8. Defendants have not brought Summary Process proceedings against Plaintiffs, and Plaintiffs continue to reside at the Property without paying use and occupancy. Am. Compl. ¶ 6 & Exhibit D; Washington Aff. ¶ 3; Raphael Decl., Exhibit C, D. Speleos Tr. at 6:6-9 and 58:20-24; Raphael Decl., Exhibit D, Deposition Transcript of Jesse Speleos at 6:18-19.

**Plaintiffs' Response:** Disputed in part. The summary process statute only allows a party entitled to the property to evict the current occupants. *See* Mass. Gen. Laws ch. 239, § 1 (only a party "entitled to the land or tenements may recover possession thereof under this chapter."). Here, Defendants are not entitled to title to the property and there is a cloud on title in the form of the Court's Memorandum of Lis Pendens. As such, any summary process proceedings would be untimely and unfeasible. *See* Docket #38, Order Entering Memorandum of Lis Pendens (Mar. 30, 2011). Furthermore, the Speleoses have been willing and able to resume making modified mortgage payments since before the foreclosure occurred.

Q. And as of today's date, how much – you haven't been making any mortgage payments?
A. **They wouldn't accept any.**

Culik Decl. Ex. 5, Dep. of D. Speleos at 38:11-13 (emphasis added). The Speleoses also continue to live in and pay to maintain the property at their own expense.

A. [I] still pay the house insurance.
. . . .
A. Condo fee. We pay a condo fee every month.
Q. What is that fee?
A. $280.

Culik Decl. Ex. 5, Dep. of D. Speleos at 23:18, 25:1.

9. In January 2011, Defendants analyzed Plaintiffs' financial documents and determined that Plaintiffs would not be able to afford the monthly mortgage payment that would result if their loan was modified under HAMP. Washington Aff. ¶ 5.

**Plaintiffs' Response:** Disputed. Defendants falsely stated that the Speleoses did not qualify for a loan modification, when in fact the Speleoses' financial documentation showed that they could pay a modified monthly mortgage payment, explained above. *See* Plaintiffs' Statement of Undisputed Material Facts, ¶¶ 17–22.

10. Indeed, Mrs. Speleos confirmed in her deposition that, as of July 2010 and prior to the foreclosure sale, Plaintiffs would not be able to afford the monthly mortgage payment that Mrs. Speleos believed was "fair," without obtaining an additional job or reducing their household expenses:

Q. . . . It appears to me that your total debt would have exceeded your net wages without even including a mortgage payment?
A. That's correct. At that point, I probably would have had to get an additional job.

Raphael Decl., Exhibit C, D. Speleos Tr. at 47:14-18.

```
Q. . . . What was the monthly mortgage payment you
   thought you should have been modified into to be
   able to afford this home?
A. Considering my interest rate had been so high when
   we got it, I was hoping that we could get into the
   $800 to $1,000 range to be fair. . . .
```

Raphael Decl., Exhibit C, D. Speleos Tr. at 50:14-19.

```
Q. In 2010, would it be fair to say you made
   approximately $300 to $400 a week?
A. Yes.
Q. So that was approximately $1,600 a month?
A. Yes.
Q. Net?
A. Yes.
Q. And your mortgage payment was $1,700?
A. Yes.
Q. And your other monthly expenses which were reflected
   on your HAMP application were approximately $2,500?
A. Approximately.
Q. Earlier you told me that you thought you could have
   afforded a monthly payment of $800 to $1,000 a
   month?
A. Yes.
Q. You thought that would have been -- I think you used
   the word fair?
A. Right.
Q. And my question is: Even if at that monthly payment
   if you were only netting $1,600 a month, how would
   you have been able to pay your other bills?
A. Well, as I said before, I would have had to make
   sacrifices. I would have possibly gotten rid of my
   cable. I would have had to possibly get a second
   job . . . .
```

Raphael Decl., Exhibit C, D. Speleos Tr. at 68:2-14 and 69:6-18.

**Plaintiffs' Response:** Disputed. Defendants' counsel's suggestion of a hypothetical payment amount to Mrs. Speleos at her deposition is irrelevant to what the HAMP guidelines would have actually required. Defendants improperly conflate what Mrs. Speleos said could be a possible modified payment with what HAMP guidelines would have required the modified payment to be. No citation is required for pointing out Defendants' mischaracterization.

11. Although Mr. Speleos received unemployment compensation after becoming unemployed in November 2009, he stopped receiving that compensation in July 2010. Mrs. Speleos informed BANA that Mr. Speleos stopped receiving unemployment compensation in July 2010. Raphael Decl., Exhibit C, D. Speleos Tr. at 45:17-46:3.

**Plaintiffs' Response:** Not disputed.

12. Mr. Speleos again received unemployment compensation beginning in August 2010. Raphael Decl., Exhibit C, D. Speleos Tr. at 47:21-48:20.

**Plaintiffs' Response:** Not disputed.

13. Mr. Speleos again stopped receiving unemployment compensation in 2011. Raphael Decl., Exhibit C, D. Speleos Tr. at 61:21-62:1-7. Since the end of the summer of 2011, Mr. Speleos has been employed as the sole owner of a painting business. That business has generated approximately $4,000 in profit since Mr. Speleos began the business. Raphael Decl., Exhibit C, D. Speleos Tr. at 61:3-20.

**Plaintiffs' Response:** Not disputed.

14. On December 21, 2010, Plaintiffs served BANA and Fannie Mae with a demand letter under Mass. Gen. Laws ch. 93A ("Chapter 93A"). Am. Compl., Exhibit C. In that letter, Plaintiffs stated that "[BANA] and Fannie Mae had a duty not to foreclose on the Speleoses when they were under consideration for a HAMP modification," and demanded a "reasonable offer of settlement." *Id.*

**Plaintiffs' Response:** Not disputed.

15. In response, BANA and Fannie Mae agreed "not to commence Summary Process proceedings until the Speleos are considered for a loan modification under HAMP." Am. Compl., Exhibit D.

**Plaintiffs' Response:** Not disputed.

16. On March 4, 2011, Plaintiffs amended their Complaint, asserting a Chapter 93A claim against BANA and Fannie Mae. Am. Compl. ¶¶ 74-85.

**Plaintiffs' Response:** Not disputed.

17. Plaintiffs also allege a negligence claim against Defendants in Count I of the Amended Complaint. *Id.* ¶¶ 40-47.

**Plaintiffs' Response:** Not disputed.

18. The Court dismissed the remainder of the claims alleged against BANA and Fannie Mae in the Amended Complaint (Counts II and III) in its October 14, 2011 Order. Docket No. 45, Order at 7. The Court also dismissed Count IV of the Amended Complaint, which was not alleged against BANA and Fannie Mae. *Id.* at 9-15.

**Plaintiffs' Response:** Not disputed.

Respectfully submitted,

/s/ *Josef C. Culik*

Josef C. Culik (BBO #672665)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
Tel (617) 830-1795
Fax (617) 830-1576
jculik@culiklaw.com

Attorney for Plaintiffs Delynn J. Speleos
and Jesse S. Speleos

December 17, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 17, 2012.

/s/ *Josef C. Culik*
Josef C. Culik