UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DELYNN J. SPELEOS and | ) | |
| JESSE S. SPELEOS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  10-11503-NMG |
| BAC HOME LOANS SERVICING, | ) | |
| L.P. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

March 11, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiffs Delynn Speleos and Jesse Speleos brought this action against BAC Home Loans Servicing, L.P., d/b/a Bank of America Home Loans ("BAC") and Federal National Mortgage Association ("Fannie Mae") alleging in their First Amended Complaint ("FAC") that the defendants were negligent (Count I) and committed unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A (Count V) by foreclosing on their home mortgage while they were being considered for a loan modification under the Home Affordable Modification Program ("HAMP").[1]  Bank of

---

[1]  All other claims against BAC and Fannie Mae, as well as against the law firm of Orlans Moran, PLLC, were dismissed on October 14, 2011 in connection with the District Judge's decision on the defendants' motions to dismiss the plaintiffs' First Amended Complaint.  See Docket No. 45.

America, N.A. ("BANA") is the successor by merger to BAC and Fannie Mae. This matter is presently before the court on the defendants' Motion for Summary Judgment (Docket No. 51). Therein the defendants are seeking the dismissal of Counts I and V on the grounds that the defendants allegedly did not cause the plaintiffs any harm or injury by foreclosing while the plaintiffs' loan modification application was pending, since the plaintiffs would not have qualified for a loan modification under HAMP due to their other debt obligations.

For the reasons detailed herein, this court finds that there are disputed facts as to whether the plaintiffs would have qualified for a loan modification under HAMP. In addition, it is disputed whether the plaintiffs' outside debt is properly considered under HAMP in the manner the defendants are now advocating. Therefore, this court recommends to the District Judge to whom this case is assigned that the defendants' Motion for Summary Judgment (Docket No. 51) be DENIED.[2]

## II.  STATEMENT OF FACTS

The following facts are relevant to the motion for summary judgment, and are undisputed unless otherwise indicated.

---

[2] In light of this conclusion, and the fact that the parties have couched the issue in terms of whether the plaintiffs would have qualified for a HAMP modification, this court will not address whether the plaintiffs should be allowed to proceed with their claims even if it is found that they would not have qualified for a loan modification under HAMP.

### Events Leading to the Foreclosure

Plaintiffs purchased their home in Taunton, Massachusetts on October 30, 2007. To finance the purchase, the plaintiffs executed a note in the amount of $175,900 payable to Stonebridge Mortgage Company.  The note was secured by a mortgage on the home in favor of Mortgage Electronic Registration Systems, Inc.  The note and mortgage were subsequently assigned and, at the relevant times, were held by Fannie Mae and/or a Bank of America entity.  Since, for the most part, the parties have not distinguished between these entities with respect to the issues raised by the motion for summary judgment, Fannie Mae, BAC and BANA will be collectively referred to herein as the "Bank" or the "defendants."

In November 2009, Mr. Speleos, a painter, lost his job.  As of November 2009, the Speleoses were current on the payments due under the Note.  At all times, Mrs. Speleos has been gainfully employed full-time as a data entry clerk.  Nevertheless, with the loss of Mr. Speleos' job, the Speleoses could not make their monthly mortgage payments.

The Speleoses have been working with the Bank in an attempt to modify their loan since March 2010.  They submitted an application for a HAMP modification, and then all additional paperwork requested by the Bank.  Their application package was complete by no later than July 15, 2010.  FAC at ¶ 22.

Despite the pendency of the HAMP application, and over the plaintiffs' numerous objections, BANA and Fannie Mae conducted the foreclosure of the plaintiffs' home on August 5, 2010.  The property was purchased by BANA.[3]

Plaintiffs commenced this action on September 1, 2010.  On December 21, 2010, they served the defendants with a demand letter as required under Mass. Gen. Laws ch. 93A.  The defendants responded by letter dated January 17, 2011 offering no financial compensation but, "[i]n an effort to resolve this matter[,]" agreed not to commence summary process proceedings until the plaintiffs' HAMP application was considered. FAC at Ex. D.  The plaintiffs amended their complaint on March 4, 2011, asserting a claim under ch. 93A.

## Financial Information

According to the defendants, Fannie Mae reviewed the plaintiffs' financial information on January 5, 2011 "in connection with a request to rescind a foreclosure sale

---

[3]  It appears from documents submitted by the defendants that the foreclosure may have been rescinded in August 2010, although that does not appear to have been disclosed to the plaintiffs.  Thus, attached to Bank counsel's supplemental affidavit are unauthenticated documents on which the defendants rely and which they refer to as Fannie Mae documents.  Those documents contain the following entry:

> 08/31/2010    b2ucbh
> Rescind Approved - BAC responsible for recision costs and any applicable fees associated with the rescind.  If loan re-enters into FCL due to the rescind, Bac will be responsible to restart the fcl process fees.  Elininate (sic) the datagram.  **Rescind approved due to file not reviewed for modification workout**.  Account under ayear (sic) old.  BAC will need to expedite this request. CHouston

<u>Raphael Supp. Aff.</u> (Docket No. 86) at ¶ 6, Ex. D at FNMA 000028 (emphasis added).

for the property previously owned by the Plaintiffs."  Defs. Supp. Mem. (Docket No. 85) at 3; Raphael Supp. Aff. (Docket No. 86) Ex. D.  But see note 3, supra.  The defendants further contend that the modification was denied, in part, because the plaintiffs' "negative cash flow demonstrated that they could not afford even a modified loan and were highly likely to default after a modification."  Defs. Supp. Mem. at 3.

The record is devoid of any evidence of a detailed analysis of the Speleoses' financial condition.  When the defendants originally filed for summary judgment, they filed an affidavit of Mayrion Washington, a Mortgage Resolution Specialist at Bank of America, N.A., who attested, without any details or supporting documentation, that "[i]n January 2011, Defendants analyzed Plaintiffs' financial documents and determined that Plaintiffs would not be able to afford the monthly mortgage payment that would result if their loan was modified under HAMP."  Washington Aff. (Docket No. 55) ¶¶ 1, 5. Following oral argument on the motion for summary judgment, this court requested additional information concerning the regulations governing loan modifications under HAMP.  In response, the defendants submitted additional information, attached to the affidavit of counsel, and now rely on the following entry to support their assertion that Fannie Mae had determined that the plaintiffs could not afford a modified loan:

| 1/05/2011 | b2ucbh |
|---|---|
| | Rescind Declined - Fina updated on 11/23/10 does not reflect borrower can afford mortgage neg $2800 as of 11/23/10.  Borrower will need to fully reinstate the loan prior to an eviction or third party sale.  **Based upon fina borrower will not qualify for MHA** Sale is final.  Account over 14mos (sic) delinquent.  C.Houston |

Raphael Supp. Aff. (Docket No. 86) ¶ 6, Ex. D at FNMA 000028 (emphasis added).

Assuming, arguendo, that this entry reflects an actual analysis undertaken by Fannie Mae, there is no evidence in the record that the defendants discussed this conclusion with the plaintiffs or otherwise explored the plaintiffs' financial ability to pay a modified mortgage amount.

It is undisputed that at the time of their HAMP application, the plaintiffs' gross monthly income that was countable under HAMP guidelines (which does not include unemployment compensation) was $2,720. The total amount due on their mortgage was $185,767.51 and their monthly escrow payment for taxes and insurance was $333.38. As detailed below, HAMP guidelines allow a mortgage to be modified so that the home-owner's monthly mortgage payment is reduced to 31% of their gross monthly income. In the Speleoses' case, this would have reduced the mortgage payment to $843.20 per month.

Based on the financial information the plaintiffs provided to the Bank, their monthly expenses, without any payment on the mortgage, came to $2,577.32. Thus, the Bank now contends that the plaintiffs would not have qualified for a HAMP modification because, in light of Mrs. Speleos' gross monthly income of $2,720, the "Plaintiffs would not be able to afford the monthly mortgage payments that would result if their loan was modified under HAMP." Washington Aff. ¶ 5. Since, the Bank argues, it determined that the plaintiffs "were highly likely to default after a modification" they could not have modified the loan under HAMP. Defs. Supp. Mem. at 3.

The plaintiffs dispute this assertion both factually and legally.  As a matter of fact, the plaintiffs contend that they could have afforded their mortgage payment if it had been reduced in accordance with the HAMP requirements.  Affidavit of Delynn J. Speleos and Jesse S. Speleos (Docket No. 89) ¶ 5.  They contend that they could have reduced their expenses, id. ¶ 6, and Mrs. Speleos testified that she could have worked additional hours to meet their mortgage obligations.  Dep. of Delynn Speleos (Ex. 5, Docket No. 74) at 49-51, 68-70.  Moreover, this court notes that the defendants have not considered the $2,100 in monthly unemployment income that Mr. Speleos was receiving which, although not applicable to the HAMP income calculation, would have been available to meet monthly expenses for at least a period of time before the unemployment payments ended.[4]  In addition, there is evidence that Mr. Speleos started his own painting company after receiving unemployment compensation, and earned income from the company.  Such income was also ignored by the Bank in connection with its motion for summary judgment.  See Dep. of Delynn Speleos at 10; DF ¶ 13.  Thus, the factual question as to whether the plaintiffs could have afforded the modified mortgage amount is not as clear-cut as the Bank contends.

There is also evidence in the record that Mrs. Speleos was told during the HAMP application process that it looked like the plaintiffs qualified for a loan modification, and

---

[4]  According to the defendants Mr. Speleos received unemployment compensation from November 2009 through July 2010, and from some time from August 2010 into 2011.  See Defendants Statement of Undisputed Material Facts ("DF") (Docket No. 53) ¶¶ 11-13.

there is deposition testimony from the Fannie Mae corporate representative that the loan could qualify for modification (although a complete analysis had not been undertaken). See Plaintiffs' Additional Statement of Undisputed Facts ("PF") and Responses to Defendants' Statement of Material Facts ("PR") (Docket No. 73) at PF ¶¶ 20-21. Thus, this court concludes that there are disputed facts as to whether the plaintiffs could have met their monthly obligations if their mortgage loan had been modified under HAMP. Therefore, the motion for summary judgment should be denied.

Furthermore, as a matter of law, the plaintiffs argue that lenders are not entitled to consider outside debt obligations in determining whether or not to grant a HAMP modification. In response, the defendants cite to the Net Present Value ("NPV") calculation provided for in the regulations. Specifically, as detailed more fully below, the regulations provide that after it is determined that a loan qualifies to be modified under HAMP, the servicer is to calculate the NPV to the lender assuming that the loan is modified and then assuming it is not modified. If the loan is more valuable to the lender if the loan is modified, the NPV is considered "positive" and the loan must be modified. In evaluating the NPV, the servicer must use a complex financial model either as provided by Fannie Mae or, if eligible, developed on its own. In assessing the NPV, one of several factors which is to be considered is whether a borrower is likely to default.

Significantly, the Bank does not contend that an NPV calculation was actually done in the case of the Speleoses' HAMP application. Thus, the outcome of an NPV calculation, on the record presently before the court, is an hypothetical exercise.

8

Moreover, as detailed below, the question whether a borrower is likely to default is not controlling in calculating the NPV and is not determinative on the issue of whether to allow a HAMP modification.  Therefore, the issue whether the plaintiffs would have qualified for a HAMP modification remains in dispute.

Additional facts will be provided below where appropriate.

## III.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994).  "[T]he nonmoving party 'may not

rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See Vineberg, 548 F.3d at 56.  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

Applying these principles to the instant case compels the conclusion that the defendants' motion for summary judgment should be denied.

### B.   Evaluating an Application for Modification Under HAMP[5]

HAMP was created by Congress under the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, and is governed by Guidelines set forth by Fannie Mae and the United States Department of the Treasury.  Pursuant to HAMP, mortgage loan servicers enter into Servicer Participation Agreements with Fannie Mae that require the servicer to perform loan modification and foreclosure prevention services as specified in the HAMP Guidelines.  In the instant case, there is no question that BANA, as servicer,

---

[5] This court has limited its analysis of the HAMP Guidelines and regulations to those submitted by the parties, and has made no attempt to independently delve into all statutory and regulatory provisions that apply to HAMP.

participated in HAMP and was required to follow Fannie Mae's HAMP guidelines.  See

PF ¶¶ 1-3, 5.

On or about April 21, 2009, Fannie Mae issued a Servicing Guide, Announcement

09-05R (hereinafter "Guide") to provide "guidance to Fannie Mae servicers for adoption

and implementation of the Home Affordable Modification Program (HAMP) for Fannie

Mae loans." Guide at 1.[6]  As detailed therein, the goal of HAMP was to "use a uniform

loan modification process" in order to help "3 to 4 million at-risk homeowners – both

those who are in default and those who are at imminent risk of default – by reducing

monthly payments to sustainable levels." Id.  It is undisputed that the plaintiffs, and their

property, met HAMP eligibility guidelines.  See id. at 2-3.  In particular, but without

limitation, the mortgage loan was a first lien conventional mortgage loan originated on or

before January 1, 2009; it had not been previously modified; the loan was delinquent; the

property was occupied and was the borrowers' principal residence; the borrowers were

suffering from a financial hardship; and the monthly mortgage payment exceeded the

amount to which it could be modified under HAMP.  Id.

Notably, the fact that borrowers may have significant debt obligations outside of

their mortgage payments does not alter their eligibility for a modification under the

HAMP guidelines.  HAMP expressly is designed for borrowers suffering significant

---

[6]  A copy of the Servicing Guide Announcement 09-05R is attached to the Culik Declaration (Docket No. 74) as Exhibit 2.  In addition, Fannie Mae issued a document addressing "Frequently Asked Questions" relating to the Guide ("FAQ"), a copy of which is attached to the same Culik Declaration as Ex. 3.

financial stresses.  Thus, borrowers seeking a modification had to attest that they were suffering from a "hardship," examples of which included "[e]xcessive monthly debt payments and overextension with creditors, e.g., the borrower was required to use credit cards, a home equity loan, or other credit to make the mortgage payment." Id. at 4, ¶ 6. As described below, HAMP addresses excessive debts of borrowers by requiring financial counseling to help borrowers bring their finances under control.

Under HAMP, the servicer must apply a "standard modification waterfall" process in order to reduce a monthly mortgage payment, inclusive of escrow for taxes and insurance, to an amount equal to, but not below, 31% of the borrower's gross monthly income. Id. at 10.  Specifically, the servicer must follow the following steps: (1) capitalize arrears, which will result in a new principal balance of the total amount due, (2) reduce the interest rate to no less than 2%, (3) extend the term of the loan to a maximum of 40 years, and (4) provide a principal forbearance so that the borrower does not have to pay interest on a portion of the principal balance. Id. at 10-11.  Applying this waterfall calculation to the Speleoses' loan would result in a total amount due of $185,767.5.  If the interest rate was reduced from its original rate of 7.75% to 2%, the term of the loan was extended to 40 years, and there was a principal forbearance of $17,412 (approximately 9.4% of the principal balance), the new monthly mortgage payment would be $843.20.[7]  This is 31% of the plaintiffs' qualifying gross monthly income of $2,720.  Thus, the application of the

---

[7]  This would be a significant savings, as the Note called for monthly payments of $1,260.17. See Raphael Decl. (Docket No. 54) at Ex. A.

waterfall calculation establishes that the plaintiffs' loan would qualify for modification under HAMP.

There is nothing in the waterfall calculation that allows for consideration of debts owed by the borrower to third persons.  Rather, the Guide provides for the consideration of such debts only in connection with the borrower's total monthly debt ratio, which is the ratio of the borrower's monthly gross expenses divided by the borrower's monthly gross income.  Guide at 12.  As detailed in the Guide, in the event that the ratio is equal to or greater than 55%, the borrower must agree to "work with a HUD-approved housing counselor on a plan to reduce their total indebtedness below 55 percent."  Id.  There is nothing in the Guide which provides that a borrower does not qualify for a HAMP modification if the ratio is equal to or greater than 55%.

Finally, the Guide provides that if the servicer determines that the borrower does not meet the underwriting and eligibility standards of HAMP, the servicer is to consider the borrower for another foreclosure prevention alternative.  Id. at 17, 33.  There is no evidence in the record that the plaintiffs were ever advised of or considered for any such alternative.

### Net Present Value

The defendants do not dispute that the waterfall calculation does not consider a borrower's ability to pay the mortgage, or that it does not consider the amount of debt owed to third parties.  Rather, the defendants argue that they "properly considered Plaintiffs' expenses – and their negative cash flow position – when processing their

13

HAMP application and denying them a modification" because "[t]he borrower's monthly

expenses are relevant to calculating the net present value (NPV) of a HAMP

modification."  Defs. Supp. Mem. (Docket No. 85) at 1-2.  This calculation is done after

a loan is found to qualify for a HAMP modification.[8]

   As an initial matter, the fact that the plaintiffs' expenses may have been relevant to

an NPV calculation is irrelevant in the instant case, since the NPV calculation was never

done.  Moreover, the defendants have cited to no authority to justify a belated calculation

conducted years after a foreclosure sale, when the borrowers' financial condition may

have changed dramatically.  Furthermore, as detailed herein, even assuming that the NPV

calculation is relevant in the instant case, the likelihood of a default after a loan is

modified is just one of a myriad of factors the servicer must consider in establishing the

NPV.  The defendants cannot simply ignore the required, complex NPV analysis.

   As detailed in the HAMP "Base Net Present Value (NPV) Model Specifications"

dated June 11, 2009 (hereinafter "Specs."),[9] after the HAMP modification is determined,

"the servicer is ready to run an NPV model calculation.  If the expected value to the

lender of the loan after a HAMP modification exceeds the expected value of the same

---

[8]  This court notes that the Guide provides that "the result of the NPV test is not used to make the decision whether or not to modify a mortgage loan owned or securitized by Fannie Mae."  Guide at 7.  While this would seem to render the NPV test irrelevant to the instant case, neither party has raised this argument, and the history of Fannie Mae's involvement in the loan is unclear from the present record.  Therefore, this court will assume that the Speleoses' loan must satisfy the NPV analysis in order to qualify for a HAMP modification.

[9]  A copy of the Specs. is attached to the second Affidavit of Neil D. Raphael (Docket No. 86) as Exhibit B.

loan to the lender if it is not modified, then the NPV test result is positive and the servicer

must modify the loan." Specs. at 2. This requirement that an NPV-positive loan be

modified is designed to ensure "that there is help for distressed borrowers when an

objective test demonstrates the modification will benefit both the borrower and the

investor." Id. Moreover, while a servicer is not required to modify a loan if the NPV test

is negative, "the servicer must consider other ways to prevent foreclosure." Id. As

detailed above, apparently no such alternatives were considered in the instant case.

Whether the servicer uses the Fannie Mae NPV model or its own, the NPV model

must accomplish specified goals. As detailed in the specifications, the NPV model used

"will:

1.   Compute the net present value of the mortgage assuming it is not
     modified.

     a.   Determine the probability that the mortgage defaults.

     b.   Project the future cash flows of the mortgage if it defaults and
          the present value of these cash flows.

     c.   Project the future expected cash flows of the mortgage if it
          does not default and the present value of these cash flows.

     d.   Take the probability weighted average of the two present
          values.

2.   In the same manner, compute the net present value of the mortgage
     assuming it is modified, incorporating the effects on cash flows and
     performance of the modification terms and subsidies provided by the
     Home Affordable Modification Program.

3.   Compare the two present values to determine if the HAMP modification is
     NPV positive."

Specs. at 2-3.  Thus, the fact that the servicer may have concerns that a borrower may default is not grounds for denying the modification – rather it is only one of many factors to be considered in determining the NPV of the loan both with or without modification.

The fact that the possibility of default is not controlling is further made clear in the Spec. directive that any NPV model used in HAMP must take into account the principal factors that influence cash flows, "including:

1. The value of the home relative to the size of the mortgage.

2. The likelihood that the loan will be foreclosed on.

3. Trends in home prices.

4. The cost of foreclosure, including:

   a. legal expenses,

   b. lost interest during the time required to complete the foreclosure action,

   c. property maintenance costs, and

   d. expenses involved in reselling the property.

5. The cost of conducting a modification, including:

   a. a lower monthly payment from the borrower,

   b. the likelihood a borrower will default even after the loan is modified,

   c. financial incentives provided by the government, and

   d. the likelihood that a loan will be paid off before its term expires (prepayment probability)."

Id. at 3.  Thus, it is clear from the HAMP regulations that a servicers' simplistic conclusion that a borrower may default even after the loan is modified is insufficient to justify a failure to offer a loan modification under HAMP.

Finally, the fact that such a simplistic conclusion is not controlling is consistent with the structure of HAMP.  By definition, HAMP is designed to assist borrowers who are experiencing financial hardships, so the fact that a modification may not solve all of a borrower's financial problems is not surprising.  Significantly, however, HAMP does not allow for forgiveness of principal, so the full principal amount of the mortgage debt remains due.  Guide at 11.  Moreover, HAMP calls for a trial period while the application is pending (and foreclosure proceedings are supposed to be suspended).  Id. at 16, 20.  A borrower must make all payments during the trial period before the modification of the loan becomes effective.  Id. at 20.  In addition, if the borrower subsequently defaults, the borrower is not eligible for another HAMP modification.  Id. at 24.  The structure appears designed to give borrowers a chance to restructure their finances to stay in their home, not to negate the benefits of HAMP by a simplistic calculation by the servicer.

In sum, since there is a factual dispute as to whether, financially, the plaintiffs could have made their monthly mortgage payments if their loan was modified, and a legal dispute as to the extent to which the defendants can properly consider the plaintiffs' financial obligations to third persons in denying the modification, this court recommends that the defendants' motion for summary judgment be denied.

### C.    Policy Considerations

Relying on Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 897 N.E.2d 548 (2008), the defendants argue that it would have been "unfair" for them to have modified the plaintiffs' mortgage in light of their belief that the plaintiffs would not have been able to make the monthly payments. The simple response to this argument for purposes of the pending motion is that there is a factual dispute as to whether or not the plaintiffs could have made the monthly mortgage payments, thereby mandating that the motion for summary judgment be denied. Moreover, Fremont, which precludes predatory lending, has no application to the instant case, and does not excuse the defendants' failure to comply with applicable regulations and standards in evaluating the plaintiffs' HAMP application.

In Fremont, the court found it to be "presumptively unfair" to issue loans with the following four characteristics, (1) the loan is an adjustable-rate mortgage ("ARM") with an introductory rate period of three years or less; (2) the loan has an introductory rate that is at least 3% below the fully indexed rate; (3) at the fully indexed rate, the loan payments are more than 50% of the borrower's gross monthly income; and (4) the loan-to-value ratio, ie. the value of the loan to the value of the property, is 100% or the loan features a substantial prepayment penalty that extends beyond the introductory period. Id. at 739, 897 N.E.2d 554. The plaintiffs' loan does not fall within this class of mortgages. Without delving too far, it is clear that the plaintiffs had a fixed rate, and not an adjustable rate mortgage, which is "the kind of loan about which the Fremont court was most concerned." Keane v. Countrywide Home Loans, Inc., No. 10-10751, 2011

18

WL 870782, *2 (D. Mass. March 11, 2011). Therefore, the Speleoses are not facing a situation, like in <u>Fremont</u>, where they were lured into a loan only to find the terms changing dramatically to their detriment.

Most significantly, however, in the instant case the HAMP program establishes the criteria for when a loan can be modified and to what extent. It establishes the waterfall calculation and the means by which the servicers are to determine if there is a positive NPV. There is nothing in <u>Fremont</u> that makes compliance with the HAMP regulations unfair. Nor is there anything in <u>Fremont</u> which excuses the defendants' noncompliance with HAMP.

## IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the defendants' Motion for Summary Judgment (Docket No. 51) be DENIED.[10]

---

[10]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-05 (1st Cir. 1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>see</u> <u>also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). <u>Accord</u> <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1, 3-4 (1st Cir. 1999); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-51 (1st Cir. 1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).

   / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge